This is number 09-3143, Robert Pollack against the United States Postal Service. Mr. Kimball. Thank you, Your Honor. Mr. Woodrow. May it please the Court. Mr. Pollack worked 14 years at the Post Office. He was an honorably discharged veteran. He'd been a military policeman. He had a good work record. He committed an offense involving no malice or gain to him that was not frequently repeated. He had no supervisory authority. There was no showing he couldn't do his job. And yet he was fired for the first offense of having a weapon in his automobile. And it's Mr. Pollack's contention that this punishment was unconscionably disproportionate to the offense at issue. It's not that Mr. Pollack shouldn't have been punished, even though he, at one point, believed that the Post Office didn't actually prohibit weapons outside the building. And what he based that on was the signs were all posted on the building or inside the building. There were no signs around the large area. This facility is very large. It has lots of roads and parking lots, and they load and unload mail. So even though I think he was wrong and his bosses thought he was wrong, it's not just completely beyond a pale that he believed that the rule was designed to prevent people from having weapons in the workplace,  In the course of disciplining him and in the course of his hearing, his supervisor exaggerated his disciplinary record. He had one formal, they call them NTOLs, or just a letter. You keep working, they call them suspension with pay, but you're actually working. It was actually lowered from the high grade to the low grade. He had a distant, some kind of a reprimand for failing to follow instructions. He certainly wasn't the angry, belligerent individual that his supervisor made him out to be. His supervisor seemed to take more umbrage at the fact that Mr. Pollack wouldn't agree with his interpretation of the rule than he did with the fact that Mr. Pollack had a weapon in his car. There was no consideration whatsoever given to alternative sanctions, which seems to me in this case, given that Pollack's history and the fact that he's no more bullheaded than anybody else that works at the post office, there's absolutely no reason to believe that he couldn't conform his conduct in the future to postal service expectations, i.e. no gun in the car. To keep his job, I'm sure that wouldn't have been a burden on Mr. Pollack, and I know he would have done it because he testified he would have done it. The hearing officer refused to hear any evidence of the bad faith, malice, the problem of this woman that wanted to get Mr. Pollack fired, that engineered his arrest for traffic offenses, which led to the post office's belief that Mr. Pollack had had a gun in his car on postal grounds, which turned out to be true. She did this in the most insidious manner possible. She had tried to get Pollack several different ways. Complained about his behavior at work, didn't work. Complained about his behavior to the criminal authorities, she'd done this before, didn't work. So now she comes up with the perfect solution. Complain about his behavior outside of work to the postal service authorities. Mr. Pollack, how can he defend that? They never charged him with any conduct against Ms. Banner. But, you know, they heard her tale of woe and her proof that he had had a gun in the car, which he did. And so certainly Mr. Pollack deserves some punishment, even though he may have been entirely rational to believe that the Postal Service of Prohibition extended to having guns in the building. But discharge, under the circumstance of this case, are just overwhelmingly unreasonable. Now, you know, you have all these different factors here. I kind of went through them in my brief. But if your honors have any questions about my theory of the case or the facts, I'd be glad to try to answer them. You think, I've forgotten her name, but the woman who precipitated the police stop, was there actually an arrest? I mean, I noticed in the papers they characterized it as an arrest. They did arrest him, Ron. They arrested him for running two stoplights. For reckless driving, I guess. There was evidence in the record that this police officer was in cahoots with Ms. Banner. He was a friend of hers. I was going to ask you, what exactly is the evidence with respect to the procurement of the arrest? You alluded to it earlier, and it wasn't clear to me what's in the record as to that aspect. I'm sorry, your honor. I'm sorry. What is the evidence in the record as to the way the arrest came about? Is there record evidence that you said she was acting in cahoots with the police officer? Is there record evidence of that? Actually, the hearing officer didn't want to hear any of this, but there was in the paper, when these American System Protection Board appeals, they start with nothing, and then there's a giant paper trail that all the parties create. There was a memo or account from Mr. Pollack himself about what happened. Let's see if I can find it here. Well, I'll look for it. Ah, here we go. You're looking for the arrest for reckless driving, right? Excuse me, ma'am? You're looking for the arrest for reckless driving? Yes, Mr. Pollack gave a lengthy statement at the point at which you're supposed to describe your case. It's on pages A41, 42, 43. He went through the circumstances of his arrest. It's on page A44, which he discusses Ms. Baumert's involvement and her efforts to get him in the past and that sort of thing. Well, he asserts that this was a set-up by Ms. Baumert, but for starters, he presumably was not privy to any conversation between Ms. Baumert and the officers. Oh, that's true. Is there any other evidence other than his assertion that there was a complicity between the parties? Well, the circumstances of the, I believe Mr. Woodrow filed a supplemental appendix in which Ms. Baumert wrote about her involvement in the arrest. And she basically got a call from the police officer who told her about the arrest. And then she told people at the post office, now why did he call Ms. Baumert? Ms. Baumert's not a human resources officer or a post official. She's just an employee there. The reason he called her was because they're buddies. That's an inference I think that's fair. That's fine. There wasn't any assertion that she had anything to do with his being arrested for reckless driving. Isn't that right? It evolved when the police officer told her what had happened and she reported it to the postal authorities. Do I have that straight? That's based on inferences that he drew from the fact that other individuals basically engaged in the same conduct he did. They leave like rats deserting the ship out there and they're all running this stoplight. He gets arrested. Nobody else gets stopped. So that's an inference that he made. He certainly has no direct evidence that the police officer was singling him out other than the fact that the police officer was singling him out. Maybe it was coincidental. But that's just evidence there. Let's hear from the Postal Service. Excuse me? Let's hear from the Postal Service. Let's hear from the other side. We'll save your rebuttal time. All right. Okay. Thank you, Mr. Kimball. Okay. Mr. Woodrow. May it please the Court. The Board correctly upheld the Postal Service's removal of Mr. Pollack for violating the weapons ban. Mr. Pollack does not dispute that he violated the Postal Service's weapons ban by bringing a loaded Glock pistol onto Postal Service property. The Postal Service properly considered each of the relevant Douglas factors in deciding that removal was the appropriate penalty, and after the administrative judge held a two-day evidentiary hearing at which Mr. Pollack testified and was represented by counsel, the Board properly concluded that removal was fully justified and was not clearly excessive, disproportionate, or arbitrary or capricious. Turning to the specific Douglas factors that are at issue in this case, the record demonstrates that the Postal Service and the Board considered each of the relevant Douglas factors that were pertinent to this case and to this situation involving Mr. Pollack. First, the agency, both Mr. Hume, the Postal Service supervisor, as well as the Board, considered the nature and seriousness of the offense. They considered the fact that the handgun Mr. Pollack had in his car was loaded. But he had a permit, did he not? He did. Yes, Your Honor. He had a permit to carry a concealed weapon. The offense was having it on postal property, not on having it. That's correct. Is that correct? That's correct. And not inside, but only in the parking lot. That's correct. And Mr. Pollack has asserted that he was unaware that the weapons prohibition extended to the parking lot. It was his belief, or at least at some point in time he held a belief, that the prohibition pertained only to the buildings of the Postal Service property. But that belief is unreasonable in this case, as the Board found, or as the Administrative Judge found, after the evidentiary hearing, for a variety of reasons. First, Mr. Pollack admits that he's aware, or was aware, of the signs on Postal Service property, including the signs on the exterior of the Postal Service property that explicitly warn against possession of weapons on Postal Service property. And the signs use the term property, and it's... On the exterior of the building, not on the exterior of the property, as you articulated. Is that correct? No. Because the property includes the parking lot. Your Honor, there are more than one sign located at the facility. There is a sign on the exterior of the facility at the entrance to the employee parking lot, as well as a sign on the building above the entrance where Mr. Pollack went in to work every day, as well as two additional signs located on internal hallways. And Mr. Pollack indicated... But these signs are not on the exterior boundary of the Postal Office property, correct? No, Your Honor. There was one sign that was located on the exterior boundary of the Postal Service property. Like a fence or something that goes around the property, and there's a sign there or... I'm not personally aware of the precise location of the sign, whether it was on a fence or on a standalone sign, but it was located, according to the record, at the entrance to the employee parking lot. Do you know offhand, do you know from the record whether this was a fenced parking lot or was it just an open area? The record does not indicate. What's your response to the argument that all they had to do was to tell Mr. Pollack, no, that sign includes the parking lot, as well as the interior of the building, just don't do it anymore, rather than fire it? Your Honor, he didn't ask. He never asked Postal Service management... Is that what it turns on, whether he asked that this includes the parking lot in terms of firing a long-term employee? No, Your Honor. The evidence is that he was aware of the prohibition, that he was aware of the signs, and that he asked his state senator for advice on whether the prohibition applied to the parking lot. But what he did not do was ask the Postal Service, which would be the logical question that he should have asked. And the penalty doesn't necessarily turn upon that one factor, Your Honor. There are a host of additional factors that both the agency and the board considered. But with respect to whether he was on notice or whether his belief regarding the scope of the prohibition was reasonable, it's apparent that if he did have a legitimate concern regarding whether the prohibition applied to the parking lot, that he should have asked the Postal Service whether the prohibition did apply to the parking lot. So you're telling us that the penalty really depends on whether the Postal Service discovered for itself that he had the gun in the parking lot as opposed to whether he told them. Your Honor, the penalty should not turn on how the Postal Service learned of the offense. In this case, it learned of the offense through a phone call from the police department, which had arrested Mr. Pollack as he exited the building, but then subsequently... He had a traffic violation. Would you fire someone from a long-term position because he had a traffic violation? No, Your Honor. The removal here was due to the fact that he violated the weapons ban on that occasion, and then he violated it again on the date of his interview, which was March 11th, so a second time. And during that interview, he admitted to having brought his weapon on the Postal Service property on other occasions. So the penalty here was fully justified in light of the fact that he had violated the weapons ban multiple times, that he had done so with the knowledge that the Postal Service prohibited bringing firearms onto its property. And the nature of the offense, certainly, was of concern to the Postal Service because of its past history with gun violence. And the penalty does not turn upon a single factor but upon a consideration of all of the Douglas factors that the agency did consider and that the Board considered as well. It also considered Mr. Pollack's past disciplinary record. What's our standard of review if we think that punishment is too severe? Your Honor, this Court should uphold the agency's and the Board's findings only if it finds that the agency and the Board's weighing of the Douglas factors was arbitrary and capricious, or that its weighing of the factors was not supported by substantial evidence. Well, but with specific reference to Douglas review, which we're doing at the second level, and really the third because you've got the agency, then you've got the Board, then you've got us, isn't it the language that I recall is totally disproportionate or grossly excessive that we've used in our cases? Is that? I mean, abusive discretion is not all that helpful, but I think that sort of language I recall from our cases. Is that right? Yes, Your Honor. The phrase is clearly excessive, disproportionate, or arbitrary and capricious. And the record here demonstrates that the agency did consider each of the relevant Douglas factors and that it weighed those factors appropriately. I thought that our language, and I just want to be clear about this, was we defer to the agency's choice of penalty unless that penalty is so harsh and unconscionably disproportionate to the offense that it amounts to an abuse of discretion. That is correct, Your Honor. And it's worth noting because Mr. Pollack does raise this argument regarding the consideration of the factors that this Court has repeatedly held that the agency need not consider every single one of the Douglas factors but only those factors that are relevant to the case. And the Board did so here. Okay. Any more questions? Any more questions? Okay. Thank you, Mr. Woodrow. Thank you, Your Honor. Mr. Kimball. Certainly, each case will turn on different factors. It just seems to me that it's pretty overwhelmingly apparent that this was an excellent case for the Board to focus on the last factor, which is alternative remedies that cost the government money when they discharge people. They've invested a lot of money in them. It ruins that person's livelihood most likely. Again, there's no evidence whatsoever that Mr. Pollack couldn't have conformed his behavior to the adamant insistence of his supervisors that he not have a weapon anywhere close to the postal property. In fact, he testified that he pretty much decided that that's what he should do. And this one occasion when he had the weapon there and was the same day they happened to be the one interviewing because of the police report, he should have taken it home. He admitted that but said he didn't want to be late for work. So this hardly seems the action of a person that's likely to engage in workplace violence. Thank you. Okay. Thank you, Mr. Kimball. Mr. Woodrow, the case is taken under submission.